# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION
# CRIMINAL ACTION NO. 3:16-CR-00113-TBR

UNITED STATES OF AMERICA,                                    Plaintiff,

v.

JAMAULE HOLLIS, *et al.*,                                          Defendants.

## MEMORANDUM OPINION AND ORDER

In 2016, a federal grand jury returned a fourteen count indictment against Jamaule Hollis and John G. Tomes for their alleged involvement in a drug trafficking conspiracy.[1] The indictment resulted from a joint investigation involving at least four separate law-enforcement agencies which, over the course of the investigation, obtained and executed six search warrants related to Tomes. Through two separate motions and a supplemental brief, Tomes seeks to exclude all evidence gathered during the execution of those search warrants. He mounts a multifaceted attack against the validity of the warrants, primarily arguing that none of the supporting affidavits established the probable cause required by the Warrant Clause of the Fourth Amendment. Ultimately, the Court finds no defect of constitutional importance with any of the searches at issue. Therefore, Tomes's First Motion to Suppress, [R. 66], and Second Motion to Suppress, [R. 68], are **DENIED**.

## I.

### A.

In 2016, a confidential source informed the Jeffersontown Police Department that Jamaule D. Hollis was actively trafficking large amounts of crystal methamphetamine in

---

[1] More recently, a federal grand jury returned a superseding indictment, bringing Derrick Perkins, Jr. and Brittany Nicole Baker into the fold too, but that fact has no bearing on the disposition of John G. Tomes's motions to suppress. [*See* R. 42 (Superseding Indictment).]

1

Jefferson County, Kentucky. [R. 75-2 at 4 (Detective Presley's Affidavit).] Following up on that tip, Detective Steven N. Presley of the Jeffersontown Police Department, along with officers from the Louisville Metro Police Department (LMPD) and agents from the U.S. Drug Enforcement Agency (DEA) and Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), began surveilling Hollis as part of a joint investigation. [*Id.* at 4–5.]

While surveilling Hollis's residence on August 17, officers saw a blue Ford Taurus registered to John Tomes arrive. [*Id.* at 5.] After a few minutes, the vehicle left and traveled to an apartment building located at 5202 Marty Lane in Louisville, Kentucky. [*Id.*] Detective Presley watched an individual, later identified as Tomes, enter the apartment building and return to the vehicle shortly thereafter. [*Id.*] Tomes then drove back to Hollis's home, stayed for a brief period, and then left again. [*Id.*]

Following that exchange, law-enforcement officers tailed Hollis as he left home and drove into downtown Louisville. [*Id.*] There, officers observed Hollis conduct several suspected drug transactions. [*Id.*] Shortly after witnessing the alleged sales, LMPD officers effectuated a traffic stop of Hollis's vehicle, which had previously been reported stolen. [*Id.*] The LMPD officers located multiple ounces of crystal methamphetamine on Hollis's person. [*Id.*]

During an on-scene interview, Hollis gave a statement to Detective Presley and Special Agent Milton Galanos of the DEA. [*Id.* at 5–6.] In that statement, Hollis identified Tomes as the person whom supplied him earlier that same day with the crystal methamphetamine. [*Id.*] Hollis reported that Tomes used the apartment located at 5202 Marty Lane as a "stash house" for illicit drugs, money, and firearms. [*Id.* at 6.] He had been to that apartment within the past twenty-four hours and saw multiple pounds of

methamphetamine and heroin inside. [*Id.*] Armed with that information, Detective Presley ran Tomes's name through law-enforcement databases and discovered that Tomes had been convicted for trafficking in narcotics before. [*Id.*]

The next day, Detective Presley applied for a warrant to search the Marty Lane apartment in order to seize crystal methamphetamine

> and any other substances in violation of KRS 218A. The scope of the search should also include any items to cut, weigh, measure, or package such substances; any items used to protect, transport or conceal said substances; all monies, property, equipment, weapons, records, tax returns, photographs, records indicia of occupancy residency or ownership; any records detailing earnings, net worth or any evidence of money laundering; and, all items derived from the [sale], use, transfer, storage, shipping, [or] handling, of such illegal controlled substance . . . .

[R. 75-2 at 1 (Search and Seizure Warrant).] A state court judge issued the warrant, which Detective Presley executed on August 18. [*Id.* at 2.] Among other things, law-enforcement officers seized a firearm, several pounds of methamphetamine, and a hydraulic press, which large-scale narcotics traffickers typically use to package significant quantities of narcotics. [R. 73-1 at 12–13, ¶ 5(c) (Special Agent Maniff's Affidavit).] The officers also observed mail addressed and identification belonging to Tomes in the apartment. [*Id.* at 13, ¶ 5(d).]

On September 7, a federal grand jury returned a fourteen count indictment against Hollis and Tomes, charging both with conspiracy to possess with intent to distribute large quantities of methamphetamine and heroin, along with firearm-related charges. [R. 11 at 1–7 (Indictment).] Law-enforcement officers promptly arrested Hollis in Kentucky. [R. 5 at 1 (Arrest Warrant Return).] Although Tomes was more difficult to apprehend, Special Agent Jonathan Maniff of the ATF, accompanied by additional agents, arrested him in California on September 20. [R. 73-1 at 14, ¶ 8.] When Tomes was taken into

custody, federal agents recovered four cellphones and approximately $5,000 on his person. [*Id.*]

**B.**

Through conversations with Special Agent Ryan N. Molinari of the ATF, Special Agent Maniff learned about the large quantities of narcotics seized at the Marty Lane apartment in Kentucky. [*Id.* at 12–13, ¶ 5(c).] Special Agent Maniff became aware that two cellphone numbers associated with Tomes had been in contact with telephone numbers belonging to suspected narcotics traffickers. [*Id.*, ¶ 5(b), (e).] Special Agent Maniff knew that drug traffickers frequently used multiple cellphones to communicate with customers and suppliers and to take photographs of drugs, cash, and firearms. [*Id.* at 15–17, ¶ 10.] Based on that information, along with his training and experience, Special Agent Maniff applied for warrants to search Tomes's four cellphones. [*Id.* at 10–11, ¶¶ 1–2.] The warrants sought to seize call log information, address book information, text messages, e-mail communications, audio and video recordings, and images

> relating to violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm); 21 U.S.C. § 841(a)(1) (manufacture or distribution of a controlled substance, or possession with intent to manufacture, distribute, or dispense a controlled substance); 21 U.S.C. § 846 (conspiracy to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance) . . . .

[*Id.* at 3–4, ¶ 1.]

Magistrate Judge Patrick Walsh issued the four warrants on September 22. [*See* R. 73-1 at 1 (Search and Seizure Warrant); R. 73-2 at 1 (Search and Seizure Warrant); R. 73-3 at 1 (Search and Seizure Warrant); R. 73-4 at 1 (Search and Seizure Warrant).] Upon execution, Special Agent Maniff discovered conversations in which Tomes coordinated the purchase of a firearm as well as suspected narcotics transactions. [R. 75-

3 at 12, ¶ 12 (Special Agent Molinari's Affidavit).] He relayed that information to Special Agent Molinari in Kentucky. [*Id.*]

## C.

Meanwhile, a few days prior to Tomes's arrest, Special Agent Molinari had identified, through law-enforcement databases, an apartment located at 9400 Deerfoot Trace in Prospect, Kentucky as an address possibly associated with Tomes. [*Id.* at 11, ¶ 11.] Special Agent Galanos obtained the lease for the apartment on September 21, which listed Yvonne Tomes, the mother of John G. Tomes, as the lessee. [*Id.*] The following week, Special Agent Molinari and Special Agent Galanos attempted to interview Mrs. Tomes at the residence twice, but no one came to the door. [*Id.* at 12, ¶ 13.] From outside the apartment, however, the agents saw a blue sedan matching the description of Tomes's vehicle in the garage attached to the apartment. [*Id.*]

In addition, the agents interviewed an unnamed source (the identity of whom Special Agent Molinari revealed to the magistrate judge) with reliable firsthand knowledge of activity in and around the Deerfoot Trace apartment. [*Id.* at 12–13, ¶ 13.] Sometime in mid-August, the unnamed source noticed a black male who matched Tomes's description, along with an older black woman, at the apartment complex. [*Id.*] The woman identified the man as her son whom, ostensibly, was helping her move into the apartment. [*Id.*] The unnamed source had not seen the woman since that day. [*Id.* at 13, ¶ 13.] Two weeks later, however, the unnamed source saw the black male moving things into the apartment from a blue sedan. [*Id.*] After speaking with the unnamed source, Special Agent Molinari inquired as to Mrs. Tomes's current address. [*Id.*, ¶ 14.] From those inquiries, he learned that her driver's license listed Fishers, Indiana as her

current residence. [*Id.*] He applied for, and Magistrate Judge Colin Lindsay issued, a search warrant for the Deerfoot Trace apartment. [R. 75-3 at 1 (Search and Seizure Warrant).] The scope of the warrant was substantially similar to that issued for the Marty Lane apartment.

## II.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Carpenter*, 819 F.3d 880, 886 (6th Cir. 2016) (quoting U.S. Const. amend. IV). If the Government flouts that constitutional command, a defendant may move, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C), to exclude the evidence gathered against him. *United States v. Haygood*, 549 F.3d 1049, 1053 (6th Cir. 2008). It is well-settled that, in seeking suppression, "the burden of proof is upon the defendant" to show that the search or seizure violated "some constitutional or statutory right." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)). In resolving a motion to suppress, the evidence must be viewed in the light most favorable to the Government. *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013) (citing *United States v. Beauchamp*, 659 F.3d 560, 565 (6th Cir. 2011)).

## III.

Through two separate motions and a supplemental brief, Tomes seeks to exclude all evidence gathered during the execution of the six search warrants described above. [*See* R. 66 (First Motion to Suppress); R. 68 (Second Motion to Suppress); R. 69 (Supplemental Memorandum in Support of Second Motion to Suppress).] He mounts a

multifaceted attack against the validity of those warrants, primarily arguing that none of the supporting affidavits established the probable cause required by the Warrant Clause of the Fourth Amendment. The Court will address each of his objections in turn. Ultimately, it finds no defect of constitutional importance with any of the searches at issue.

**A.**

To begin, Tomes raises three issues surrounding the search of the Marty Lane apartment. First, he argues that the allegations in Detective Presley's affidavit were insufficient to establish probable cause. [*See* R. 68 at 2–3.] Second, even if supported by probable cause, Tomes maintains that the warrant itself was so lacking in particularity as to amount to no warrant at all. [*See* R. 69 at 8–10.] Third, he claims that Detective Presley made "recklessly false statements" in his affidavit and, accordingly, demands a *Franks* hearing on that issue. [*See* R. 68 at 3.] Of those three arguments, the Court finds merit in none.

**1.**

The Warrant Clause of the Fourth Amendment guarantees that "no [w]arrants shall issue, but upon probable cause, . . . and particularly describing the place to be searched, and . . . things to be seized." U.S. Const. amend. IV. The test for probable cause is simply whether "there is a fair probability that [1] contraband or evidence of a crime [2] will be found in a particular place." *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). There must, in other words, be a "nexus" between the place to be searched and the evidence sought. *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015).

The job of the judge "presented with a search warrant application is 'simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit,'" both propositions ring true. *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (alteration in original) (quoting *Gates*, 462 U.S. at 238). The duty of a reviewing court, in turn, is "to ensure that the [issuing judge] had a substantial basis for concluding that probable cause existed." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *Gates*, 462 U.S. at 238–39). In making that determination, the reviewing court is limited to examining the information contained within "the four corners of the affidavit." *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009) (citing *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)).

Here, Detective Presley's affidavit established a substantial basis for the state court judge to find probable cause to search the Marty Lane apartment. In detail, law-enforcement officers observed Tomes leave Hollis's residence, make his way to the Marty Lane apartment, and then return to meet Hollis a short time later. [R. 75-2 at 5.] Following the rendezvous between Hollis and Tomes, LMPD officers arrested Hollis and discovered multiple ounces of crystal methamphetamine on his person. [*Id.* at 5–6.] During an on-scene interview, Hollis named Tomes as his supplier and described the Marty Lane apartment as a "stash house" for illicit drugs, money, and firearms. [*Id.*] Importantly, Hollis had been to that apartment within the past twenty-four hours and saw multiple pounds of methamphetamine and heroin inside. [*Id.* at 6.] Based on that information alone, Detective Presley's affidavit gave the issuing judge a substantial basis to conclude that a search of the Marty Lane apartment might uncover evidence of wrongdoing. *See United States v. Pelham*, 801 F.2d 875, 878 (6th Cir. 1986) ("When a

witness has seen evidence in a specific location in the immediate past, and is willing to be named in the affidavit, the 'totality of the circumstances' present a 'substantial basis' for conducting a search for that evidence.").

**2.**

Nonetheless, Tomes takes exception to the first search on a second ground. The way he sees things, the warrant itself failed to describe the things sought with particularity. [*See* R. 69 at 8–10, ¶¶ 21–25.] Tomes appears to take issue with the breadth of the language authorizing agents to search for and seize crystal methamphetamine

> and any other substances in violation of KRS 218A. The scope of the search should also include any items to cut, weigh, measure, or package such substances; any items used to protect, transport or conceal said substances; all monies, property, equipment, weapons, records, tax returns, photographs, records indicia of occupancy residency or ownership; any records detailing earnings, net worth or any evidence of money laundering; and, all items derived from the [sale], use, transfer, storage, shipping, [or] handling, of such illegal controlled substance . . . .

[R. 75-2 at 1.] The laundry list of items, Tomes argues, left "limitless discretion" to the officers executing the warrant and, therefore, ran afoul of the Fourth Amendment. [R. 69 at 9, ¶ 23.] The Court disagrees.

As discussed earlier, the Warrant Clause of the Fourth Amendment mandates that a warrant must "particularly describ[e] . . . the persons or things to be seized." U.S. Const. amend. IV. The chief (though not sole) purpose of the particularity requirement is "to prevent general searches by requiring a neutral judicial officer to cabin the scope of the search to those areas and items for which there exists probable cause that a crime has been committed." *Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco & Firearms*, 452 F.3d 433, 441 (6th Cir. 2006) (en banc) (citing *Stanford v.*

*Texas*, 379 U.S. 476, 481 (1965)). The degree of specificity required in a warrant varies depending on (1) what information is reasonably available to the authorities, *United States v. Hanna*, 661 F.3d 271, 286–87 (6th Cir. 2011), (2) the nature of the "crime involved," as well as (3) the "types of items sought," *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (quoting *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001)). *See generally* 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.6(a) (5th ed.), Westlaw (database updated Oct. 2016).

Here, each of these factors goes to show that the scope of the authorized search and seizure was set out with particularity. First, consider the information available to law enforcement. As discussed above, the officers had probable cause to suspect that Tomes was trafficking in narcotics and had been convicted of drug trafficking (a felony) in the past. [R. 75-2 at 6.] The officers suspected, on good authority, that Tomes was using the Marty Lane apartment as a "stash house" for drugs, firearms, and cash. [*Id.* at 5–6.] Of course, those agents had no idea how Tomes stored, prepared, and packaged the drugs, or where and in what form he kept records of his transactions. *See United States v. Lengen*, 245 F. App'x 426, 433 (6th Cir. 2007) ("Because of the very nature of contraband drugs and any drug-trafficking operation, a warrant cannot be expected to identify exactly the weights or quantities of controlled substances and paraphernalia that might be found in a private dwelling."). "All the officers had to go on was the well-substantiated suspicion that there was drug trafficking afoot" involving Tomes's home. *United States v. Raglin*, 663 F. App'x 409, 412 (6th Cir. 2016). In circumstances such as these, there was not much more Detective Presley could have included than what he did: that the officers were looking for evidence of drug trafficking.

Next, look at the nature of the crime involved. Drug trafficking is a crime that often generates the same distinctive evidence from case to case. *United States v. Martin*, 920 F.2d 393, 399 n.7 (6th Cir. 1990) (listing, in way of example, "chemicals, money, firearms, records, ledgers, beepers, scales, telephone numbers, a variety of common household items and related narcotic paraphernalia"). Here, the warrant anchored the search to evidence of a particular crime, *e.g.*, trafficking in methamphetamine. [R. 75-2 at 1.] Viewed in context, therefore, the use of a seemingly generic list does not fall short of the Fourth Amendment's demand for particularity. *See United States v. Willoughby*, 742 F.3d 229, 233 (6th Cir. 2014) (holding that "broad list of items" was sufficiently particular where "a global modifier" limited the scope of the search "to a list of offenses for which there was probable cause to think [the defendant] had committed"); *accord United States v. Reeves*, 210 F.3d 1041, 1046–47 (9th Cir. 2000) (holding objected-to "catch-all phrases" in warrant were not overbroad when viewed "in the context of authorization for a search for 'evidence of the possession, manufacture, and delivery of the controlled substance methamphetamine'").

Lastly, examine the types of things sought. Many of the items listed in the warrant (*e.g.*, crystal methamphetamine, drug paraphernalia, and weapons) amount to nothing more than contraband and, as such, required no detailed description. *See United States v. Campbell*, 256 F.3d 381, 389 (6th Cir. 2001) ("If the purpose of the warrant is to seize illicit property or contraband, however, a general reference is permissible."), *abrogated on other grounds by Begay v. United States*, 553 U.S. 137 (2008), *as recognized in United States v. Evans*, 378 F. App'x 485, 489 n.5 (6th Cir. 2010). *See generally* LaFave, *supra*, § 4.6(b). The remaining things, though perhaps not contraband,

were at least instrumentalities or evidence of those crimes and, as discussed earlier, were described with as much particularity as possible prior to the search. *See* LaFave, *supra*, § 4.6(d). All things told, the warrant "supplied enough information to 'guide and control the agent's judgment in selecting what to take.'" *Willoughby*, 742 F.3d at 233 (quoting *Richards*, 659 F.3d at 537). It is not objectionable on that basis.

### 3.

Rounding out his challenge to the first search, Tomes maintains that Detective Presley made "recklessly false statements" in his affidavit about the information that Hollis supplied to the authorities. [*See* R. 68 at 3.] He demands a hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to test the veracity of Detective Presley's account. His arguments on that point, however, come up short.

To merit a *Franks* hearing, the movant must make "a substantial preliminary showing" that (1) the affiant included a statement, either deliberately false or with reckless disregard for its truth, in the warrant affidavit, (2) without which there could be no finding of probable cause. *United States v. Pirosko*, 787 F.3d 358, 369 (6th Cir.), *cert. denied*, —— U.S. ——, 136 S. Ct. 518 (2015). Warrant affidavits "carry with them 'a presumption of validity,'" and so the challenger's attack "must be more than conclusory." *United States v. Stuart* 507 F.3d 391, 396 (6th Cir. 2007) (quoting *Franks*, 438 U.S. at 171). That is, he must point to specific false statements and then "accompany his allegations with an offer of proof," usually in the form of supporting affidavits. *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990).

In this case, Tomes has not made any showing, let alone a strong showing, that Detective Presley included a false statement of some sort in the warrant affidavit. He has

come forward with nothing more than a bare allegation that Detective Presley intended to mislead the issuing judge. His allegation is bereft of any factual support. In circumstances such as these, a *Franks* hearing is unwarranted. *See United States v. Young*, 847 F.3d 328, 349 (6th Cir. 2017).

**B.**

Next, Tomes challenges the search of the four cellphones seized incident to his arrest. [*See* R. 66 at 4–8.] It is true that, as a general proposition, law-enforcement officers must obtain a warrant before searching the digital contents of a cellphone seized incident to arrest. *Riley v. California*, —— U.S. ——, ——, 134 S. Ct. 2473, 2495 (2014). In this case, Special Agent Maniff did just that, but Tomes takes exception. Tomes argues that the allegations in Special Agent Maniff's affidavits fell short of establishing the required nexus between the things to be searched (the cellphones) and the evidence sought (information relating to his possession of firearms, involvement in narcotics trafficking, and conspiracy). [*See* R. 66 at 4–8.] On that point, Tomes is mistaken.

Special Agent Maniff's affidavit established a substantial basis for the magistrate judge to find that the four cellphones likely contained evidence of the criminal conduct at issue. The affidavit described the investigation of Tomes, his criminal history, the resulting indictment against him, his subsequent arrest, and the contraband seized during the search of the "stash house" in Kentucky. [R. 73-1 at 11–14, ¶¶ 5–8.] Those findings pointed to Tomes's probable involvement in narcotics trafficking on a large scale. [*Id.* at 12–13, ¶ 5(c).] Special Agent Maniff opined, based on his training and experience, that drug traffickers often used cellphones to communicate with customers and suppliers, as

well as to photograph narcotics and weapons, [*id.* at 15–17, ¶ 10], and that law-enforcement personnel could retrieve that stored information, [*id.* at 17–21, ¶ 11]. The affidavit went on to explain that Special Agent Molinari had linked at least two cellphone numbers associated with Tomes to telephone numbers belonging to other suspected narcotics traffickers. [*Id.* at 12–13, ¶ 5(b), (e).] With information of this sort, the affidavit contained sufficient detail to tie the four phones to Tomes's alleged criminal conduct. *Compare Bass*, 785 F.3d at 1079 (finding evidentiary nexus between cellphone and charge of identity theft where defendant and his co-conspirators used cellphones to communicate and defendant had been using his cellphone immediately prior to arrest), *and United States v. Gholston*, 993 F.2d 704, 717–20 (E.D. Mich. 2014) (finding evidentiary nexus between cellphone and charge of robbery where investigation showed that multiple participants were involved), *with United States v. Ramirez*, 180 F. Supp. 3d 491, 494–496 (W.D. Ky. 2016) (finding lack of evidentiary nexus between cellphone and charge of drug conspiracy where affidavit contained mere conclusory allegations and no reference to the fact of defendant's indictment).

## C.

Finally, Tomes attacks the warrant to search the Deerfoot Trace apartment on two fronts. To start, Tomes argues that the allegations in Special Agent Molinari's affidavit fail to show a nexus between the Deerfoot Trace apartment and any evidence of criminal activity. [*See* R. 68 at 3–7; R. 69 at 10–14, ¶¶ 26–35.] Next, he maintains, though in a somewhat conclusory fashion, that the "investigative information" in Special Agent Molinari's affidavit was "stale." [*See* R. 69 at 7, ¶ 19.] The Court finds neither point persuasive.

**1.**

Though a close call, Special Agent Molinari's affidavit established a substantial basis for the magistrate judge to find a nexus between the Deerfoot Trace apartment and evidence of criminal conduct. Where law-enforcement officers independently corroborate the fact that someone is a known narcotics trafficker, there will generally be a sufficient nexus between his residence and evidence of that crime for purposes of the Fourth Amendment. *United States v. Kenny*, 505 F.3d 458, 461–62 (6th Cir. 2007); *United States v. Miggins*, 302 F.3d 384, 392–94 (6th Cir. 2002) (collecting cases); *cf. United States v. McPhearson*, 469 F.3d 518, 524–25 (6th Cir. 2006). In this case, Special Agent Molinari did just that.

First, the independently-corroborated information in Special Agent Molinari's affidavit permitted one to draw the reasonable inference that Tomes had been actively involved in narcotics trafficking. The affidavit described the investigation of Tomes, his criminal history, the resulting indictment against him, his subsequent arrest, the contraband seized during the search of the "stash house" on Marty Lane, as well as incriminating messages found during the search of his four cellphones. [R. 73-3 at 8–12, ¶¶ 6–12.]

Second, the affidavit linked Tomes to the Deerfoot Trace apartment. Although the Deerfoot Trace apartment was leased in Yvonne Tomes's name, there no indication that she actually resided there. [*Id.* at 12–13, ¶¶ 13–14.] Instead, most things pointed to Tomes use of the residence. During a knock-and-talk visit to the apartment, Special Agent Molinari and Special Agent Galanos saw a blue sedan matching the description of Tomes's vehicle in the attached garage. [*Id.*, ¶ 13.] Subsequently, the agents spoke with

an unnamed source who described seeing a black male matching Tomes's description, along with the blue sedan, at the apartment on prior occasions. [*Id.*]

Third, based on his training and experience, Special Agent Molinari reasonably suspected that a search of the premises would turn up evidence of the charges against Tomes. Special Agent Molinari knew that drug traffickers commonly used secondary residences. [*Id.* at 6, ¶ 5(b).] In many cases, drug traffickers maintained those residences in the name of a third-party associated with them. [*Id.* at 6–7, ¶ 5(g).] Among other things, drug traffickers used these locations to store narcotics, firearms, and records, receipts, and ledgers. [*Id.* at 6–8, ¶ 5(b), (d)–(h), (*l*).]

In sum, the totality of these circumstances established a sufficient nexus between the location to be searched and the things to be seized, and the magistrate judge had a substantial basis for concluding so. The warrant to search the Deerfoot Trace apartment is, therefore, not infirm on that basis.

### 2.

Tomes disagrees. He argues, in a perfunctory fashion, that the "investigative information" in Special Agent Molinari's affidavit was "stale." [*See* R. 69 at 6–8, ¶¶ 15, 18–19.] Since Tomes has not identified precisely what information he finds objectionable, it is difficult to resolve that issue in detail. Having thoroughly reviewed the affidavit, however, the Court finds that Special Agent Molinari's affidavit (discussed above) relied on "fresh," as opposed to "stale," information.

It is well-established that stale information cannot be used "in a probable cause determination." *United States v. Frechette*, 583 F.3d 374, 377 (6th Cir. 2009) (citing *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)). *See generally* LaFave, *supra*,

§ 3.7(a). The staleness inquiry "depends on the 'inherent nature of the crime'" and the circumstances of the case. *United States v. Abernathy*, 843 F.3d 243, 250 (6th Cir. 2016) (quoting *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988)). To determine the expiration date of information, courts in this Circuit consider four factors:

> (1) the character of the crime (chance encounter in the night or regenerating conspiracy?), (2) the criminal (nomadic or entrenched?), (3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), and (4) the place to be searched (mere criminal forum or secure operational base?).

*United States v. Burney*, 778 F.3d 536, 540 (6th Cir.) (quoting *Frechette*, 583 F.3d at 378), *cert. denied*, ––– U.S. –––, 135 S. Ct. 2877 (2015).

In this case, none of those factors weigh in favor of finding the "investigative information" stale. First, the crimes at issue—conspiracy, drug trafficking, and possession of a firearm—bear a closer resemblance to "a regenerating, enduring enterprise" than "to a 'chance encounter in the night.'" *Id.* at 541. Second, the criminal under investigation—Tomes—displayed firm ties to the area. After all, a drug trafficking operation, by its very nature, relies on "an established network of distributors and customers," and so is not akin to "the kind of nomadic or sporadic criminal enterprises likely to up-and-vanish under the cover of darkness." *Id.* Tomes's prior drug trafficking conviction in Kentucky underscores that fact. *See United States v. Sinclair*, 631 F. App'x 344, 348 (6th Cir. 2015). Third, the evidence to be seized under the warrant included anything tending to show that the Deerfoot Trace apartment, like the Marty Lane apartment, was used as a stash house. "Unlike evidence of drug possession, evidence that a residence is being used as a stash house is unlikely to be consumed or to disappear, precisely because that evidence—scales, weapons, safes, bagging materials, and the like—is not readily consumable and is 'of enduring utility to its holder.'" *Burney*, 778

F.3d at 541. Fourth, the place to be searched in this case was Tomes's residence, which is a "secure operational base." *United States v. Elbe*, 774 F.3d 885, 891 (6th Cir. 2014). In sum, the information in the affidavit was not stale.

## IV.

**IT IS HEREBY ORDERED** that John G. Tomes, Jr.'s First Motion to Suppress, [R. 66], and Second Motion to Suppress, [R. 68], are **DENIED**.

**IT IS FURTHER ORDERED** that the In-Person Evidentiary Hearing set for **April 19, 2017 at 2:00 p.m. EST**, [R. 86], is **CANCELLED**.

**IT IS FURTHER ORDERED** a Telephonic Further Proceedings is **SET** for **April 19, 2017 at 10:00 a.m. EST**. The Court shall place the call to counsel.

**IT IS SO ORDERED**.

Date:

cc: Counsel of Record